MISSISSIPPI DRUM *et al.* Defendants in Error, *vs.* THORN-
TON G. CAPPS, Exr., *et al.* Plaintiffs in Error.

*Opinion filed June 16, 1909.*

1. WILLS—*a person capable of transacting ordinary business is generally capable of making a will.* A person who is capable of buying and selling property, settling accounts, collecting and paying out money or borrowing and loaning money must usually be regarded as capable of making a valid will.

2. SAME—*prejudice against natural objects of person's bounty is not necessarily an insane delusion.* A person may be prejudiced against some of his children or against persons who are the natural objects of his bounty and may make unjust remarks about them without having a proper foundation for his conduct, but it does not necessarily follow that he has an insane delusion or that he is without testamentary capacity.

3. SAME—*what does not establish an insane delusion.* Proof that the testatrix (a former school teacher and a believer in education) felt an attachment for the institution of learning which her only daughter was attending at the time of the daughter's death; that she grieved long and deeply over such death and spoke of feeling under obligations to the institution of learning, and that she was at times cross to her relatives, does not establish that her seeming antipathy to her relatives and her attachment to the institution resulted from an insane delusion or a disordered mind.

4. SAME—*fact that a person has hardening of arteries does not necessarily destroy her testamentary capacity.* The fact that the testatrix was affected with hardening of the arteries does not show that she was without capacity to make a will, particularly where there is proof that she capably transacted business matters up to the time of her death, and where the will, which she wrote herself, and a letter written by her two days before her death, tend strongly to show that she was capable of transacting business and recognizing the objects of her bounty.

5. SAME—*the Supreme Court may set aside verdict against the weight of the evidence.* If the verdict of the jury in a will contest case is against the clear preponderance of the evidence the Supreme Court may set it aside, notwithstanding the evidence for the party in whose favor the verdict was returned, if considered alone, would be sufficient to sustain it.

FARMER, C. J., dissenting.

WRIT OF ERROR to the Circuit Court of Greene county; the Hon. ROBERT B. SHIRLEY, Judge, presiding.

This is a suit to contest a will. Martha E. Cameron, a widow, with no children or descendants of children, died on December 9, 1904. Her nearest relatives and heirs-at-law were brothers and sisters, nephews and a niece. The will of Mrs. Cameron was executed September 13, 1901, and reads as follows:

"I, Martha E. Cameron, of the city of Greenfield, county of Greene, State of Illinois, being of sound mind and memory, do make and declare this to be my last will and testament, in manner following, to-wit:

"*First*—I give, devise and bequeath unto my sister Mississippi Drum one thousand ($1000) dollars, to be held in trust for her, the interest to be paid for her support when her means are exhausted. If the interest be not sufficient for her needs the principal may be used. In case any of said thousand dollars be not used for her benefit it will revert to the estate, to be used as hereinafter devised.

"*Second*—To my sister Louisiana Whitlock, of the county of Greene and State of Illinois, one promissory note for $300, payable one day after date to George W. Cameron, my deceased husband, signed by Z. T. Whitlock, dated October 22, 1880; also two hundred ($200) dollars in money.

"*Third*—To my sister Henrietta Sink, of Venice, county of Madison and State of Illinois, I give one promissory note for $100, payable to George W. Cameron one day after date, signed by her husband, T. W. Sink, and John R. Sink, dated September 9, 1873; also $200 in money.

"*Fourth*—To Leander J. Overby, my brother, $500 on any note I may hold against him at my death. In case he should pay such note or notes he to be paid $500 in money and my book-case and books. If he should die before I do, the same to go to his heirs. He lives at Farmersville, Montgomery county, Illinois.

"*Fifth*—To William J. Overby, my brother, (residence not known,) one promissory note for $20, date April 25,

1889, and $200, to be paid in installments of not more than $20 per month. If he die first his heirs to be paid the same.

"*Sixth*—To the children of Julia A. Doyle, my sister, deceased, $200, to be divided equally between them, namely, George W. Doyle, Louis Thomas Doyle, Agnes O. Doyle, all of Montgomery county, Illinois.

"*Eighth*—To Florence B. Curtis, of Cedar Rapids, Iowa, my late husband's niece, $500. .

"*Ninth*—To Edward E. Cameron, of Greenfield, Illinois, one promissory note for $300, payable to Thomas Matlock, dated June 17, 1893, signed by Charles E. Cameron and Martha E. Cameron.

"*Tenth*—To the trustees of the Million cemetery, $100, to be a perpetual fund, to be loaned by trustees and interest used for keeping said cemetery in good condition.

"*Eleventh*—My clothing, beds, bedding, furniture, pictures and all my household goods of which I may die possessed to be divided between my surviving sisters equally, or as nearly so as convenient.

"*Twelfth*—I give to the Illinois Wesleyan University, situated at Bloomington, Illinois, my house and lot, described as follows: One hundred and forty-eight feet off the east end of lot 75, in Cooper's addition to the town (now city) of Greenfield, county of Greene, State of Illinois; also all money or lands or any other property of which I may died possessed.—In witness whereof," etc.

The will was properly witnessed according to law. On January 22, 1904, she added a codicil, ratifying and confirming her former will, except "so far as any part of it is inconsistent with this codicil," which directed that a few of her personal effects should be sold and applied to general bequests; that some of her furniture should be given to the local W. C. T. U.; gave to the Baptist Church of Greenfield $100; to her sister Henrietta Sink, and to a niece, Clara B. Valentine, $100 each, and appointed T. G. Capps, executor. The codicil was duly witnessed.

Mrs. Cameron's husband, George W. Cameron, died intestate in 1886, leaving Mrs. Cameron, his widow, and Florence Cameron, their only child. · From the record it appears that his estate was worth from $15,000 to $17,000. Mrs. Cameron was appointed administratrix of his estate and guardian of the daughter. Afterwards Mrs. Cameron made her final report, and the court entered an order vesting the entire estate in her and discharging her as executrix and guardian. It was stipulated that at the date of her death Mrs. Cameron's estate was worth $21,000. The will and codicil were probated in the county court of Greene county February 5, 1905. A little less than a year thereafter suit was brought to contest the will. It appears that after the issues were settled a jury trial was had, and on April 11, 1907, the jury brought in a verdict finding this to be the last will and codicil of Martha E. Cameron. On motion for a new trial this verdict was set aside and a second trial was had on March 4, 1908, on the same issues of fact, before a jury, the court instructing that there was no evidence of undue influence, the second jury finding and returning a verdict that the instruments were not the will and codicil of Martha E. Cameron. A motion for new trial by proponents was overruled and decree entered on the verdict. From that decree this writ of error has been prosecuted.

KERRICK & BRACKEN, and H. H. MONTGOMERY, for plaintiffs in error:

A delusion is said to be a belief in a state or condition of things the existence of which no rational person would believe. *In re Forman,* 54 Barb. 274; *Prather* v. *McClelland,* 76 Tex. 574; *Schneider* v. *Manning,* 121 Ill. 376.

A delusion has also been defined as a spontaneous conception and acceptance, as a fact, of that which has no real existence except in the imagination, and persistent adherence to it against all evidence. *Smith* v. *Smith,* 48 N. J.

Eq. 566; *Rush* v. *Megee,* 36 Ind. 69; *Philadelphia Trust Co.* v. *Drinkhouse,* 17 Phila. 23.

A delusion is a conception that originated spontaneously in the mind without evidence of any kind to support it, which can be accounted for on no reasonable hypothesis, having no foundation in reality and springing from a diseased condition of the mind. *Potter* v. *Jones,* 20 Ore. 239.

An insane delusion must be such an aberration as indicates an unsound or deranged condition of the mental faculties, as distinguished from a mere belief in the existence or non-existence of certain supposed facts or phenomena based upon some sort of evidence. A belief which results from a process of reasoning from evidence, however imperfect the process may be or illogical the conclusion, is not an insane delusion. An insane delusion is not established when the court is able to understand how a person might have believed all that the evidence shows he did believe and still have been in full possession of his senses.

If the verdict of a jury that a testatrix is insane is against the clear weight of the evidence the Supreme Court has power to set aside a decree entered on the verdict, notwithstanding the evidence of the successful party, standing alone, would be sufficient to sustain the decree. *Bradley* v. *Palmer,* 193 Ill. 15; *Owen* v. *Crumbaugh,* 228 id. 380.

It is not enough that a delusion may exist, but its connection with the testator's will must be made manifest and shown to have influenced its provisions before the will can be set aside and declared void. *Potter* v. *Jones,* 20 Ore. 239.

Where, in a will contest, the contestant alleges insane delusion, consisting in what is claimed to be irrational belief in something non-existent, it is incumbent upon the contestant, in order to prove the existence of such a delusion, to prove that the testator has not the slightest ground or reason whatsoever for entertaining such a belief; and it is immaterial whether or not the testator has, in fact, any real ground or reason for entertaining such belief, unless

the circumstances are such that the court can say that no rational mind could entertain such a belief. *Bradley* v. *Palmer*, 193 Ill. 15.

An insane delusion is a belief in something impossible in the nature of things or impossible under the circumstances surrounding the person entertaining it, which no rational person would entertain and which refuses to yield to evidence or reason. *Scott* v. *Scott*, 212 Ill. 597.

In order to set aside a will on the ground of insane delusion the conduct of the testator in making the will and with reference thereto must be such as cannot be explained on any other ground than that it was the result of an insane delusion. *Schmidt* v. *Schmidt*, 201 Ill. 191.

It is not necessary that a person making a will shall have retained all his vigor of mind and memory. It is sufficient if the mind and memory of the testator were sound enough to enable him to know and understand the business in which he was engaged at the time he executed the will, judging his competency of mind by the nature of the act to be done and a consideration of all the circumstances of the case. *Graybeal* v. *Gardner*, 146 Ill. 345; *Carpenter* v. *Calvert*, 83 id. 66; *Campbell* v. *Campbell*, 130 id. 479; *Meeker* v. *Meeker*, 75 id. 266.

RAINEY & JONES, and D. J. SULLIVAN, for defendants in error:

It is no longer regarded as the test of testamentary capacity that the testator have sufficient mental capacity to transact ordinary business. *Craig* v. *Southard*, 148 Ill. 37.

A person may have mental capacity to transact ordinary business affairs and even to understand that he is then making his will, yet if he is at the time affected by an insane delusion as to the natural objects of his bounty or as to the persons he names as beneficiaries in such will, and is controlled by such delusion to such extent that he makes a will which he would not otherwise have made, then he is not of

sound mind, within the meaning of the law applicable to this subject. *Roe* v. *Taylor,* 45 Ill. 490; *Bible Society* v. *Price,* 115 id. 637; *Petefish* v. *Becker,* 176 id. 455; *Orchardson* v. *Cofield,* 171 id. 27; *Kaenders* v. *Montague,* 180 id. 305; *Owen* v. *Crumbaugh,* 228 id. 400.

The courts of this State clearly recognize that there may be insanity without the general business capacity of the individual being affected thereby. *Bible Society* v. *Price,* 115 Ill. 638; *Searle* v. *Galbraith,* 73 id. 272.

Unreasonable prejudice against relatives may constitute ground for setting aside a will where it amounts to an insane delusion,—that is, where the testator's conduct can be explained on no other ground than that of mental unsoundness and where the disposition of the property is thereby affected. *Huggins* v. *Drury,* 192 Ill. 528.

An insane delusion may consist in a morbid perversion of the mind toward those who are the natural objects of the testator's bounty. (*Bible Society* v. *Price,* 115 Ill. 637.) Or there may be an insane delusion in the mind of the testator in regard to his duty or moral obligation to make a will in favor of a particular individual, corporation or society. *Orchardson* v. *Cofield,* 171 Ill. 28; Jarman on Wills, (5th ed.) 38, and notes; Redfield on Wills, (3d ed.) 72-74, and notes; *Nicewander* v. *Nicewander,* 151 Ill. 156.

In the absence of error of law, the verdict of a jury will not be disturbed, on appeal, if the evidence for either party, considered alone, will sustain it. *Petefish* v. *Becker,* 176 Ill. 448; *Long* v. *Long,* 107 id. 210; *Harp* v. *Parr,* 168 id. 459; *Moyer* v. *Swygart,* 125 id. 268.

Mr. JUSTICE CARTER delivered the opinion of the court:

The evidence shows that the testatrix was an educated woman and interested in church and temperance work. Before her marriage she had been a school teacher. After her appointment as administratrix of her husband's estate she opened a bank account and successfully managed and

controlled the funds and property. The proof in the record indicates that under her management the estate showed a net increase in value from $4000 to $6000, and that this could not be attributed to a rise in real estate. From the death of her husband to her own she practically transacted all her own business and that of her husband's estate. She drew her own checks, negotiated loans, collected them, took mortgages, made leases on real estate, kept the pass-book furnished by the bank, and entered in her own handwriting the date, amount and payee of each check, with few exceptions, from April 19, 1902, to December 6, 1904. These checks aggregated in number several hundred. About fifty of them were signed and written from December 29, 1899, to April 14, 1902, and some eighty-one covering a period from April 14, 1902, to December 6, 1904. She was treasurer of the local W. C. T. U. from October, 1896, until her death, the treasurer's book being kept in her own handwriting. There are 433 entries in this book of small sums collected by her periodically from the local members at Greenfield and items of disbursements and remittances to the central society. The loans that she made ranged from $100 to $1600. She obtained at one time forty acres of land under mortgage foreclosure, which she leased one year and sold the next. All of her loans turned out good with one exception, that being to a merchant in Greenfield, amounting to $200, which after his death paid about seventy-five cents on the dollar. The evidence shows that she was ailing, physically, some time before her death; that she had some trouble with her stomach and one or two attacks of *la grippe;* that she had heart trouble, which the physicians said was caused by the hardening of the walls of the arteries, and one of the physicians claimed that she had valvular trouble of the heart independently of the arterial trouble; that the latter trouble was progressive in its nature and grew worse towards the close of her life; that she died from the bursting of a blood vessel in the brain,

due to this condition of the arteries. She went to the store to do a little trading on December 9, 1904, and on her way home the blood vessel burst and she died a few hours after.

The chief contention in the briefs is whether the testatrix was influenced in executing her will by insane delusions. Counsel for defendants in error in their briefs say: "The evidence tended to show that during a considerable portion of the time, down to the date of her death, Mrs. Cameron could transact her business affairs; but the evidence also tended strongly to show that the result of her malady was to fix in her weakened mind an unnatural hatred for those who were the natural objects of her bounty, and to cause her to be controlled by an erroneous idea that she was under some great, overpowering obligation to the Illinois Wesleyan University." Counsel for plaintiffs in error contend that there is no evidence in the record indicating that the testatrix was subject to insane delusions; that, on the contrary, the great preponderance of the evidence goes to show that she was of sound and disposing mind and memory, not only when the will but also when the codicil was executed.

Naturally, Mrs. Cameron had great affection for her only daughter, Florence. She took a deep interest in her progress and determined to give her a college education. The Illinois Wesleyan University, at Bloomington, Illinois, was selected, and in order to be with her daughter while attending this school she rented a house and established a home there in the fall of 1890. The mother and daughter liked the school very much. Florence attended there one year, but seems to have been in poor health towards the end of the year and died August 1, 1891, aged seventeen, apparently from heart trouble. Testatrix moved her household goods back to Greenfield and resided there until her death. The evidence tends to show that she was much interested in the university from the time her daughter passed away until her own death. About 1895 she gave to the

university $1000 to establish a "Florence Cameron scholar-ship" as a memorial to her daughter. For this the university gave her its note for $1000, bearing six per cent annual interest until the death of testatrix, when the note was to be regarded as canceled and paid. The interest was paid and the note canceled at her death, as agreed. The university authorities in 1896 published a historical sketch of the school, with a record of the alumni and other appropriate matters, and obtained from testatrix a picture of her daughter, which was published, along with a short sketch telling about her attending school there and of her sudden death at the close of the first year; also speaking of the $1000 which had been given as a memorial, and referring to Mrs. Cameron as a woman of fine business ability and a firm friend of the university.

We will give a brief synopsis of the evidence upon which counsel for defendants in error base their claim that testatrix was of unsound mind.

Mary L. Strickland, a lady seventy-two years old, who had known testatrix twenty years and lived just across the street from her for seventeen years in Greenfield, testified that the night after Florence's death Mrs. Cameron acted rather strange; that if anyone sympathized with her she ran into a bed-room and shut the door; that the testatrix thought the Wesleyan University was a great school,—no other like it,—and did not seem to be interested in anything but her daughter and the university; that in talking about her daughter often near the close of her life she would cry; that testatrix had the "grip" some time about December, 1900 or 1901, and thereafter was not the same towards anybody; that testatrix was cross with her sisters, and would not allow her sister, Mrs. Drum, who lived with her during the last years of her life, to go any place; that she often scolded Mrs. Drum, while the latter always treated testatrix kindly, gave her medicine, nursed and helped to dress and look after her.

Mrs. Chennuth lived four blocks from testatrix at the time of her death and was for several years her next door neighbor. She testified that after Florence's death Mrs. Cameron grieved greatly and would speak and cry about it often, and that she grieved "more or less the last part of her life;" that she had heard testatrix speak of the university at Bloomington and her daughter's connection with it, frequently; that testatrix, when melancholy, would be cross to her friends, and especially to her sister, Mrs. Drum, and would tell Mrs. Drum, sometimes when others were there, to keep still, whereupon Mrs. Drum would either say nothing or hang her head and cry; that Mrs. Cameron was a very weak woman during the last four years of her life and Mrs. Drum did most of the housework; that testatrix would sometimes get on her clothing wrong and Mrs. Drum would help her straighten it out; that Mrs. Cameron told the witness once that she got up in the night during the last year of her life and by mistake put some of her clothing on the stove and burned it; that testatrix also told her that once during the last year of her life she went down town and got lost, and sometimes she would get lost in her own house at night, or in her yard; that she did not think that at times during the last four years of testatrix's life she was of sound mind.

Clara B. Valentine, a niece by marriage, testified that Mrs. Cameron grieved very greatly about the death of her daughter and felt a great attachment for the school at Bloomington; that she persuaded witness' sister to go to Bloomington and take music lessons, and loaned her $100 for that purpose; that Mrs. Cameron did not grieve as many women do, but grieved continually, and this increased as the years went by; that she would often take the book which had the picture and sketch of the daughter and the account of the scholarship, and sit and look at it and read over the piece and frequently showed it to visitors; that once testatrix was talking with witness about the univer-

sity and having given $1000 to it shortly before, and told her she felt under obligations to the university and it pleased her to give this; that witness told her that having done this she thought she had discharged her obligations to the institution; that testatrix acted as if she were not pleased with this statement and turned abruptly to another subject. The witness further stated that testatrix had the "grip" in 1901, and in 1903 had a second attack of the same disease and remained quite feeble to the time of her death; that testatrix was somewhat unkind to Mrs. Drum,—"unkind and peevish, like sick people are;" that Mrs. Drum would treat testatrix as if she were a sick person and take no notice of the unkind treatment. This witness testified that in 1901, and down to the date of her death, testatrix was of unsound mind.

Joseph J. Crouch, one of the witnesses to the codicil, had been a neighbor of testatrix in Greenfield for about eighteen years. He thought her mind was weak and had been for a year or less. The codicil was probated on this witness' testimony. On cross-examination he could not say positively that he had not told persons after her death that the will and codicil were all right and would stand, but stated that he had no recollection of saying it.

Lulu Whitehead, a niece, testified that she had visited Mrs. Cameron a number of times during the last years of her life; that testatrix had an attack of "grip" in 1901 and witness visited her in June of that year; that on some things at times testatrix was all right and other times not right at all; that Mrs. Drum wanted a new dress and testatrix would not allow her to buy it; that witness, on request, took some of Mrs. Drum's money and bought material and Mrs. Drum made the dress; that testatrix said thereafter that she did not think Mrs. Drum had made it and lied when she said she had, though the dress was made in testatrix's house and in her presence; that one time witness and her aunt spent a day in the country, and Mrs. Cameron

found she had on an old dress and was very much worried about it all day; that frequently she could not properly dress herself,—would put her collar on upside down or wrong side out and not put her skirt or bonnet on straight, and would have to be helped by others; that she resented Mrs. Drum's presence, though the latter was always kind to testatrix; that Mrs. Drum had about $700 of her own money; that testatrix once told witness she had left Mrs. Drum sufficient means to maintain her; that the testatrix spoke once in her presence about wanting Mrs. Drum to go to an old ladies' home but that Mrs. Drum objected, and that testatrix then said to witness that she absolutely refused to have anything more to do with Mrs. Drum. Witness did not consider testatrix a woman of sound mind.

Contestants placed on the stand Oscar Ford, a Baptist minister, who testified concerning a conversation at a funeral service with a lady who apparently might have been Mrs. Cameron, but as the witness did not know testatrix and as no testimony was introduced to show that the statements of the lady on that occasion as to the religious belief of the family were untrue, the testimony will not be further gone into.

Emily J. Short testified that she had known Mrs. Cameron all her life, though the last conversation they had was six years before testatrix's death,—that is, in 1898. Testatrix and witness exchanged visits at their respective homes about two months after Florence's death. The witness testified that testatrix talked during these visits of the university at Bloomington and talked and cried a good deal about her daughter; that testatrix said she felt interested in the university and that she had given it $1000.

Blanche Walker, a niece of Mrs. Strickland, saw testatrix practically every day during the last year of her life. She testified that Mrs. Cameron was confined to her bed a good deal of the time that year and that Mrs. Drum washed and dressed her; that testatrix did not want anyone to sit

up with her at night and would object if anyone advised it; that she was cross to Mrs. Drum and that the latter was very kind to testatrix; that testatrix was cross to others, though not so much so as to Mrs. Drum; that she did not walk steady but dragged her feet; that she did not think testatrix was of sound mind.

Mina Overby, a niece of Mrs. Cameron, stated that she was at her aunt's home in August, 1901, two or three days, and in 1902, and again in 1904; that her aunt had a bad spell of the "grip" in the winter of 1900-01; that she was feeble; that Mrs. Drum was doing the housework and gave the testatrix such care as persons in that condition usually require; that part of the time she was not able to dress herself. Afterwards, on a leading question by counsel for the defendants in error, she stated that Mrs. Cameron was mentally unable, also.

John Bassham, a witness called by plaintiffs in error, testified, that he was a liveryman in Greenfield and had known testatrix twenty years and had business transactions with her; that on December 6, 1904, a business transaction was closed up between them, he giving her a note and mortgage and she giving him a check on the bank in payment therefor, and that he found when he got to the bank that the paper was filled out in the form of a note; that when witness' attention was called to it by the banker a new check was made out and he took it back to Mrs. Cameron, who signed it; that he did not think testatrix was of sound mind at that time. It may be noted, however, that he himself did not notice the mistake until his attention was called to it by the banker.

J. G. Burns was also called by plaintiffs in error. He was a farmer living near Greenfield and had done considerable business with Mrs. Cameron and he had always thought her a little queer,—not violently insane, but just queer. He, however, testified that he had never seen anything to indicate that she was incapable of doing business,

and he did not state in any particular how she acted or talked so as to make him think she was queer.

Dr. J. A. Cravens testified that he resided at Greenfield and had practiced his profession in Greene county eleven years; that he had treated testatrix from December, 1903, to the time of her death, in 1904; that she had stomach and heart trouble; that he had observed that the walls of the arteries were beginning to harden, and that this diminished the size of the blood vessels and blood supply; that this condition was well developed in 1903; that it was a disease that came on slowly; that her general condition when he began treating her was much depleted and impoverished; that he was called in about December 20, 1903, when she had an attack of "grip," and she responded very slowly to treatment; that she was not out of the house much during the winter months, although not always confined to her bed; that she was very irregular in her gait and stopped very often; that she would have to steady herself when she rose from a chair and would have to stand a few seconds before starting off; that when she got herself balanced she could walk fairly well. He testified that the medicines were administered by Mrs. Drum; that she was irritable towards Mrs. Drum, and a little towards the doctor himself because she was not improving as rapidly as she thought she should; that he saw nothing in Mrs. Drum's conduct to cause testatrix to be cross to her; that testatrix seemed to be a little cross and fretful at times, but he thought that would be excusable in a person who had been sick so long; that he thought testatrix had mentioned that her daughter had attended the university at Bloomington and that she spoke very favorably of the institution; that he could not tell whether she has spoken frequently of this or not; that she spoke to him about Mrs. Drum, and said that after she (testatrix) was gone she would like to have Mrs. Drum go and live at some old ladies' home; that he thought during the last six months of her life she was not of sound

mind; that during that time she was rational on some sub-
jects at times; that he noticed nothing to indicate any
unsoundness of mind towards any of her relatives, except
that she was a little irritable towards Mrs. Drum; that she
seemed to think her sisters expected great compensation
from her for services they rendered, although he had never
heard any of the sisters speak of compensation.   The wit-
ness was asked if he did not know that the sisters had filed
claims for $3000 against the estate; and the court refused
to allow the question to be answered.   We think as the
subject of compensation had been gone into, as it was on
direct examination by counsel for defendants in error, that
counsel for plaintiffs in error should have been permitted
to prove that the sisters had actually filed claims against
the estate.

Dr. F. A. Clement testified that he had been a practic-
ing physician in Greenfield for nearly twenty-five years and
that he had treated testatrix's daughter, Florence, in 1891,
and had prescribed a few times for Mrs. Cameron previous
to that and occasionally for two or three years thereafter;
that he had not had any conversation with her since 1898
or 1899, although he had seen her on the street perhaps
once a month, or oftener, and had noticed her condition;
that at the time he treated her he discovered that she had
arterio sclerosis, or hardening of the arteries; that this dis-
ease caused a great depression and would place the subject
in a generally low condition, and that it continued with tes-
tatrix as long as she lived; that it was a disease of old
age; that at the time he was treating her she talked a good
deal about her daughter, which was not unnatural, but she
never spoke to him of the death of her daughter without
having it connected with a great obligation and benefit she
had derived from the Wesleyan University; that he thought
she had delusions; that he had seen her stop suddenly on
the street, as if she had heard someone call her or a noise
that did not exist.   The doctor further testified that a per-

son might be of unsound mind from the disease in question and be able to transact business; that almost invariably persons with this disease have capacity to transact ordinary business and at the same time have an unnatural antipathy towards their relatives; that the disease with which she was afflicted was progressive, in slow stages; that she also had a disease of the main valve that empties the blood from the heart, which shut off the blood supply to the brain, and that he thought this was caused by grief.

We think we have given the main facts of all the testimony that would indicate Mrs. Cameron was not of sound mind and memory. All of these witnesses who touched on the point admitted that she was capable of doing ordinary business, so far as they ever saw or heard.

The general rule of law is, that a person who is capable of transacting ordinary business is also capable of making a valid will. If he is capable of buying and selling property, settling accounts, collecting and paying out money or borrowing or loaning money, he must usually be regarded as capable of making a valid disposition of his property by will. (*Meeker* v. *Meeker,* 75 Ill. 260; *Yoe* v. *McCord,* 74 id. 33; *Carpenter* v. *Calvert,* 83 id. 62; *Freeman* v. *Easly,* 117 id. 317.) This is admitted to be the law by contestants, but they insist that at the time testatrix executed her will she was laboring under insane delusions concerning the natural objects of her bounty and the obligations she was under to the Wesleyan University. This court has stated that "insane delusion consists in the belief of facts which no rational person would have believed." (*Schneider* v. *Manning,* 121 Ill. 376; *Nicewander* v. *Nicewander,* 151 id. 156.) And again, in *Scott* v. *Scott,* 212 Ill. 597, we said (p. 603) : "An insane delusion is a belief in something impossible in the nature of things, or impossible under the circumstances surrounding the afflicted individual, and which refuses to yield either to evidence or reason." In the same case we said: "Such a delusion does not exist unless it is

one whose fallacy can be certainly demonstrated, for except such demonstration can be made it cannot be said that no rational person would entertain the belief." This court in the recent case of *Owen* v. *Crumbaugh,* 228 Ill. 380, quoted the above definitions with approval, and in this last case, and in *People* v. *Hubert,* 63 Am. St. Rep. (Calif.) 72, insane delusions were discussed at length. In a work on insanity by Brower and Bannister, published in 1902, we find the following definition (p. 47) : "An insane delusion is a false belief that is incompatible with the training, education and general environment of the individual, and * * * should be contrary to the usual habit of thought of the individual." In *Schneider* v. *Manning, supra,* we said (p. 382) : "There may be, and doubtless are, cases where a person may be able to transact some business and yet be incapable of making a will on account of an insane delusion which has destroyed the mind on a subject relating to that particular act." To the same effect are *American Bible Society* v. *Price,* 115 Ill. 623, *Huggins* v. *Drury,* 192 id. 528, and *Searle* v. *Galbraith,* 73 id. 269.

A person may become prejudiced against some of his children or the natural objects of his bounty without a proper foundation and make unjust remarks about them, but it does not necessarily follow that he has insane delusions or is devoid of testamentary capacity. "An eccentric man or a peculiar man is not disqualified from selling or disposing of his property by devise. If such was the case, many people might be deprived of that right, as but few men can be found who are not in some respects peculiar." (*Schneider* v. *Manning, supra,* on page 386.) Weakness of mind and insanity are of various degrees. "It is impossible to fix them in general, or to mark precisely the frontiers,— the almost imperceptible limits,—which separate insanity from sanity, or to number the degrees by which reason declines and falls into annihilation. It is necessary to consider such degrees so far, only, as they afford circumstances

of evidence of legal competency or incompetency of mind."
(Shelford on Lunatics, 2 Law Lib. *37.) This court, in
*Campbell* v. *Campbell,* 130 Ill. 466, held that to constitute
a sound and disposing mind it is not necessary that the
mind should be wholly unbroken, unimpaired and unshat-
tered by disease or otherwise, or that the testator be in pos-
session of all his reasoning faculties; that a man may be
competent to make a disposition of his property by will
where it is simple and easy of comprehension and at the
same time be incompetent to make a will which involves a
very large estate and the consideration of the natural claims
of a large number of relatives. Clearly, by reason and
authority, therefore, each case must be largely judged in
connection with its own special facts, circumstances and
surroundings.

What is shown by this record to indicate that testatrix
was of unsound mind? It is argued, as has been hereto-
fore stated, that she showed an unnatural antipathy or ha-
tred for her relatives, the natural objects of her bounty,—
especially towards her sister, Mrs. Drum,—and that she
felt under a great obligation towards the Wesleyan Uni-
versity and in some way recognized an inseparable tie be-
tween this university and her daughter. Does the evidence
bear out either of these contentions? We have set out at
some length the testimony bearing on both of these ques-
tions. It will be noticed that only six witnesses,—Mrs.
Strickland, Mrs. Chennuth, Mrs. Valentine, Mrs. Short,
Miss Overby and Dr. F. A. Clement,—testified as to her
talk about the university. So far as we can judge from
Dr. Clement's testimony, her talks with him about the uni-
versity were shortly after Florence's death,—probably eleven
years before testatrix's death and about eight years before
the will itself was made. Mrs. Short apparently did not
think her talk about the university was unnatural or unrea-
sonable. Miss Overby's testimony indicates that although
she visited her aunt every year during the last three years

of her life, Mrs. Cameron only spoke about the university once during one of these visits, and this talk seems to have been in 1901, but we would not judge from Miss Overby's testimony that she thought there was anything strange or unreasonable in the talk. Mrs. Chennuth stated that testatrix talked "more or less" about the university from the time of her daughter's death as long as she lived, but there is nothing to indicate in her testimony that testatrix's feelings of obligation for the university increased as the years went by. On the contrary, we should draw the opposite conclusion from Mrs. Chennuth's testimony on this point. Mrs. Strickland testified, it is true, that the talk about the university increased as the years went by; but this witness was a very old lady, and a reading of her testimony in the record impresses one very strongly with the idea that she, herself, was nervous and considerably agitated by the interruption of the lawyers, and that her memory, probably on account of her age, was somewhat indistinct. Mrs. Valentine also testified positively that her aunt's talk about the university and interest in it increased during the latter years of her life, but it is obvious from this witness' testimony that she, herself, was also interested in the school and often talked with her aunt about it and brought her articles commenting on the work there, as did the rest of Mrs. Valentine's family. We see nothing in the testimony with reference to testatrix's interest in the university that indicates in the slightest particular an unsoundness of mind. She had always been interested in education, taught school in early life, and after her husband's death wanted to give their only daughter a college education. After investigating certain schools she took her daughter to this university and kept house for her during the year her health permitted her to attend. Everything goes to show that the school associations were very pleasant both for the daughter and mother, and the mother, after Florence's death, would naturally be deeply interested in the school of which they had

such agreeable memories.    Testatrix had no relatives to
whom she was under obligations to leave property, in view
of the circumstances shown on this record.    Her property
did not come from her own relatives but from the hus-
band's estate, to which she added by good business man-
agement.    Can it be said on this record that no rational
person, situated as was testatrix, would desire to donate a
large portion of her property to this school?    It seems to
us that instead of being the act of an insane person it was
a most natural and reasonable thing for testatrix to de-
cide to do.

What witnesses testified as to the testatrix's treatment
of her sister, Mrs. Drum?    They are the following:    Mrs.
Strickland, Mrs. Chennuth, Mrs. Valentine, Mrs. White-
head, Blanche Walker, Mina Overby, Dr. Cravens and Dr.
Converse.    It is very manifest from reading the testimony
of these witnesses in the record that her irritable and peevish
talk towards her sister was largely what would be almost
certain to be said by any person who had been sick to the
extent she had.    Indeed, Mrs. Valentine said, in terms, that
her talk towards her sister was of the same character as
sick people always indulged in.    Dr. Cravens said that "like
all old people, and some younger people I treat, she was
sometimes irritable; that is not unusual with old people."
This record is absolutely silent as to her having shown
any antipathy towards any other relative.    It is true, Mrs.
Strickland said she was cross to her sisters, but she did
not specify any actions or mention any names; and it is
also true a few of the relatives testified she was cross to
them, and that three or four of the witnesses testified that
she was cross to other people, but none of them mentioned
names.    In every instance, however, the record shows quite
plainly that her crossness was what might often be expected
from a sick person.

Testatrix had given Mrs. Drum a home with her for
some ten years.    There is nothing in the record to indicate

.that the testatrix was not fully competent to look after her household duties and her own work until the last three or four years of her life, and, indeed, the testimony is very slight to indicate that she could not do this up to within the last year before her death. The evidence does, however, show that Mrs. Drum helped about the housework. The argument is that Mrs. Drum did so much work in looking after the house and in nursing testatrix during the last years of her life that she was entitled to something more than board. The testimony shows that Mrs. Drum was at the time of the testatrix's death about sixty-two or sixty-three years of age, and while lame from some cause, so as to be unable to walk without a cane, she was apparently in fair health during the years she resided with testatrix. That the latter felt she should do something for her sister is shown by the will, and she told Mrs. Whitehead that she had left Mrs. Drum sufficient to maintain her. It appears that Mrs. Drum had $700 of her own money and testatrix left her $1000 more. The fact that Mrs. Cameron desired that after her own death her sister, Mrs. Drum, should go into an old ladies' home does not tend to show insanity on the part of testatrix. It might well be argued that it tended rather to prove that she was desirous of doing what would be best for Mrs. Drum, who was an elderly widow lady, with no children. At Mrs. Drum's age the $700 she already had, added to the $1000 bequeathed in the will, might not be considered too small, if the principal were carefully expended, to support her for the rest of her life in the moderate style in which she had been living, and especially if she made her home with some of the surviving brothers or sisters, who had, apparently, as much obligation in this respect as did Mrs. Cameron. Conceding that she did not leave Mrs. Drum sufficient to support her, this does not indicate that testatrix was of unsound mind. The law is, as we have stated, that a person making a will must be in such condition of mind that he not only knows the nat-

240—35

ural objects of his bounty, but must have sufficient intelligence to appreciate his relations to them. (*Petefish* v. *Becker,* 176 Ill. 448.) Testatrix left something to all of her living brothers and sisters and to a deceased sister's children. We do not think any person familiar with the facts in this case can read this will and codicil without feeling that every section bears the impress of such knowledge and appreciation on the part of testatrix. That she did not distribute her property equally, or as the jury apparently thought she should have distributed it, or as this court might think, does not show that she was of unsound mind. In *Graybeal* v. *Gardner,* 146 Ill. 337, we said (p. 345): "There is no evidence whatever in the record tending to show that he did not know the character and value of his property or that he did not remember the natural objects of his bounty." The same may be said as to the case at bar.

Thirteen witnesses are all that gave any testimony upon which by any possibility could, be based an argument that testatrix was insane at any time. Three of these, Dr. Cravens, Bassham and Crouch, gave testimony that could not in any way affect the soundness of mind at the time she drew her will but only at the time of the codicil. Dr. Cravens said that although he had attended her a year before her death he did not notice anything wrong in her mental condition except the last six months, and then only at times. Bassham testified that he did not think she was of sound mind when he had business transactions with her a week previous to her death, and yet he borrowed $600 or $700 of her at that time, dealing with her as if she were a sane person. Crouch was one of the witnesses to the codicil and thought she was of weak mind at the time she signed the codicil, not quite a year before her death. But it is obvious from the testimony of all these witnesses that they thought her of disposing mind previous to the last year of her life. There are left only ten witnesses whose testimony in any way affects the soundness of her mind at the time

she executed the will, and it may be remarked in passing that the main contention of counsel for defendants in error is as to the execution of the will and not as to the codicil, because they concede that the codicil changed in no material way the provisions of the will itself. Of these ten witnesses, Mrs. Strickland, Mrs. Short and J. G. Burns gave no opinion as to her mental soundness. Burns said he thought she was a little queer but that she was capable of transacting business. Mrs. Strickland stated facts from which counsel strenuously insist testatrix was insane. No special stress is placed upon Mrs. Short's testimony, except as to the obligations to the university, to which we have heretofore referred. As to Edgar Ford's testimony we have already spoken. Dr. F. A. Clement had no conversation with testatrix for five or six years before her death, and based his testimony largely upon his treatment of her and conversations with her seven or eight years before the will was made. Blanche Walker had only known her a year before her death. This leaves only four witnesses who were so situated that their testimony as to this particular case covered the actual time when the will was executed, and their opinions can be of no great weight unless tested by the actual facts upon which they are based, so that the court may judge as to the value of the opinions. (*Stackhouse* v. *Horton,* 15 N. J. Eq. 202.) Besides the evidence we have already commented on with reference to the Wesleyan University and the treatment of Mrs. Drum by testatrix, what other evidence do these witnesses offer that would justify a decision that the testatrix was of unsound mind? Mrs. Chennuth is the witness who testified as to Mrs. Cameron putting some of her clothing on a stove and getting it burned, and also as to testatrix getting lost when she went down town and getting lost in the house at night. We have already commented on the fact that all of this testimony of Mrs. Chennuth was based upon what Mrs. Cameron herself told the witness, and it all occurred dur-

ing the last year of Mrs. Cameron's life, so that it would not, except in the most indirect way, influence any conclusion as to testatrix's mental condition at the time she executed the will itself,—something over three years before her death. Would there be, however, justification for the conclusion that testatrix was of unsound mind simply because in the night she should by mistake place some of her clothing upon a hot stove? There is no explanation as to how this was done except what testatrix told Mrs. Chennuth, and the latter's testimony on this question is very general and indefinite. It is not at all strange or inconsistent with the mental soundness of testatrix that in her physical condition during the last year of her life she should have been puzzled in her house at night as to where she was. Even well people, in their full mental and physical vigor, often have the same experience. Nor is it at all strange, in her physical condition, that she failed to recognize her location once or twice when down town. The details as to those occasions are not given, and it is not stated whether it was daytime or in the dark. Here, again, even people of unquestioned mental and physical ability have had similar experiences on coming out of a building and unconsciously turning in the wrong direction.

There are a few other specific acts relied on by counsel for defendants in error to indicate mental unsoundness on the part of testatrix. One or two of the more prominent ones we will refer to.

Mrs. Whitehead testified as to testatrix saying she did not believe Mrs. Drum had made a certain dress, already referred to, although she had seen Mrs. Drum working on the dress. The only inference, we think, which can be drawn from this testimony is, not that testatrix had a delusion on this question, but either that her memory was faulty or that she wanted to hector, find fault with and criticise Mrs. Drum. This desire, of course, would not indicate an insane mind, unless it could be argued that it

tended slightly to show that she had an antipathy towards her sister which was founded in an insane delusion.

The evidence of some of the witnesses tends to show that testatrix, during the last years of her life, did not wish the neighbors or relatives to sit up with her, and it is argued from this that she had a dislike for her relatives. This argument, it seems to us, is without force, as the testimony shows that she did not want the neighbors to sit up with her either. It is quite obvious that she objected to people sitting up with her because she did not think she needed such attention and did not want to be an unnecessary care or burden to her neighbors or relatives.

The hardening of the arteries to which the physicians testified was undoubtedly affecting testatrix the latter years of her life. The doctors called it atheromatous arteries, caused by old age, or arterio sclerosis, both of which, as we understand the testimony, were intended to mean the same disease. The evidence and the authorities show that this is quite a common disease of old age, and it may or may not produce a softening of the brain or premature senility. (Brower-Bannister on Insanity, 256.) The effect of this disease on cerebral activity is to "diminish the arterial caliber and thereby lessen nutrition. This may reach a complete degree and in the brain give rise to localized anæmia and softening. * * * Arterio sclerosis is certainly an accompaniment of old age, and is a fair index of the wear and tear the individual has undergone and of the remaining vital capacity. * * * The cerebral symptoms produced by arterio sclerosis cover a wide range but are all due to faults of brain nutrition. They embrace those of senility, premature senility and degenerative processes, both chronic and acute," which result in lessening the vitality. (Church-Peterson on Mental Diseases, pp. 192-193.) "The distinction between insanity from arterial disease of the brain and from certain types of senile mental decay is not a very clear one, especially since the former

occurs, as a rule, in the down-hill period of life and is attended with other more or less similar conditions of general bodily decay. It may often properly be counted as a rather more pronounced form than usual of senile insanity, differing from the usual type only in its more marked symptoms and its commonly earlier appearance. 'That a man is as old as his arteries' is a wise medical saw, but in most cases the brain wasting from rigid arteries does not cause insanity, and senile dementia, when it appears, comes on in the later stages of life." 5 Buck's Reference Handbook of the Medical Sciences, (1902) p. 94; see, also, Warfield on Arterio Sclerosis, (1908) p. 85; Russell on Arterial Sclerosis, (1908) p. 185.

It is manifest from the testimony in this record, as well as from standard authorities on this question, that old people frequently have hardening of the arteries without in any way incapacitating them from doing ordinary business or from executing deeds or wills. "A certain degree of decay of the mental powers is a natural consequence of advanced age. It may therefore, within certain limits, be considered a normal change, these limits being marked by slight failures of memory or capacity for mental work." (Brower-Bannister on Insanity, p. 306.) And this condition will naturally be accentuated if along with advancing age a person has more than ordinary hardening of the arteries. The memory of many old people whose sanity no one questions is often not as good as in early life, but this fact will not necessarily incapacitate them from executing a will; and while old people, whether especially troubled with hardening of the arteries or not, some days feel better able to transact business and their memory is clearer at some than at other times, still if any person, solely from the effects of this disease, was so incapacitated as to be incompetent, at any time, to execute a will, the mental condition of that person would so often manifest itself that those who did business with him would almost certainly notice his

failing mental powers. This is in harmony with the evidence in this record and the medical authorities on this subject, and it is a fact of which the members of this court could almost take judicial notice. Now, what was the condition here? The evidence shows, without contradiction, that testatrix, certainly within a year of her death, was competent to do ordinary business. The great weight of the testimony is that she was competent to do ordinary business to the day of her death. To the very last she conducted her own business affairs, leaving an estate worth some $21,000. Those who testified to her mental unsoundness all admitted her ability to manage her own business, and we see nothing in the record to support the argument of counsel for defendants in error that an investigation of her business transactions would prove that she did not have good business ability. The contrary, we think, is overwhelmingly shown.

It is quite a remarkable fact, in view of the contentions of defendants in error, that no witness in the case claimed that he had ever heard the mental soundness of the testatrix questioned before her death, except that one or two of the relatives claimed that it had been suggested and talked over by relatives while testatrix was alive. It would seem most reasonable that if her mental condition was at all unstable, that fact would have been commented on by her friends and those with whom she did business. Five or six witnesses have sworn that she was of unsound mind at the time she executed the will, and three more that she was of weak mind during the last few months of her life, and a few others gave facts upon which arguments were based by counsel to indicate that she was insane. Some thirty witnesses testified that they had had business transactions with her and that she was capable of looking after and attending to ordinary business affairs. Some of these, it is true, testified that they had no opinion as to whether her mind was sound or not, a few of them saying they

were not experts on insanity, but none of these had ever seen or had their attention called to anything that would indicate she was of unsound mind. These witnesses included her banker, the post-master, the hardware man, the coal dealer, the drayman, her minister, the doctor who had treated her from 1896 or 1897 to the latter part of 1903, and persons who had purchased or leased land of her and had carried on various business transactions in connection with the local W. C. T. U., the church and her business affairs. The will, executed in September, 1901, was prepared and written by the testatrix herself. It is impossible to study it and reach any other conclusion than that Mrs. Cameron fully understood what she was doing, and her relations to all the legatees, at the time she drafted it. A number of letters written by testatrix were introduced, all of which tend to show that she was of sound mind and memory. The following letter she wrote two days before her death:

"*Dear Niece Florence Curtis*—I was so glad to get a letter from you, and Birdie was so much better. I have great hopes that she will get entirely well. I am so thankful to you for your kind offer in my sickness. Bell was real sick last week,—neuralgia of the stomach,—but she has gotten over her spell and is about well. Bell sent for us to come and spend the day with them yesterday. I was driven out in the Bassham bus and back in the evening. I enjoyed the day very much. I felt disappointed when you did not come to the fair. It is a long way from your place, but people— (First page of letter ends at this point.)

"I have not heard whether Eddie went to the fair or not. In fact, I have not heard from him since he went home from here, a year ago. Bell did not go to Carlinville this fall, neither did she go to the fair. She said her feet and ankles were not strong enough. Bertha spent three days at the fair. Luther graduated at the summer examination. Of course, they can run the store without the hired man. Of course, it keeps Luther very busy, and Harvey gets $100 per month pension. I cannot walk. My ankles are very weak. I can walk about the house and to the nearest neighbors. I do not gain strength. I do not expect to get well. I will probably go off in my sleep. I can't get a stitch of plain sewing done. I will have to buy ready-made wrappers and night dresses if I can get to the store. Your Uncle Shade is not well,—

keeps a man in the store. He has to go home and lie down every day. I am glad to hear that you are all so well and hope you will continue. I took a short course of medicine a few days ago but I don't know that I am benefited by it. The weather is fine—is very dry. There has been no rain. There has not been a flake of snow here this fall. The weather has been very warm. I am hopeful the winter will remain warm. Love to all.

"Your Aunt,

M. E. CAMERON."

Can anyone read this letter and say that testatrix was afflicted with senile dementia or softening of the brain, whether brought on by hardening of the arteries or from any other disease of old age? The will drafted by her and this letter written by her demonstrate, it seems to us, most strongly, that her mental powers were not so diseased that she was incapable of doing ordinary business or recognizing the natural objects of her bounty.

It is argued by defendants in error that the verdict of the jury should not be disturbed, on appeal, where the evidence of either party, if considered alone, would sustain it,—citing in support of this contention, *Moyer* v. *Swygart,* 125 Ill. 262, *Long* v. *Long,* 107 id. 210, *Harp* v. *Parr,* 168 id. 459, and *Petefish* v. *Becker, supra.* The rule here contended for by counsel is not the law of this State, although there are some expressions in the cases cited tending to support counsel's argument. We had occasion, however, in *Bradley* v. *Palmer,* 193 Ill. 15, to review the authorities on this question fully, and we there held that the authorities cited, fairly construed, do not support the contention of counsel; that the rule of law in this State is, that if the verdict of the jury finding the maker of a will sane or insane is against the clear weight and preponderance of the evidence this court has a right to set aside the verdict, notwithstanding the evidence of one side, considered alone, would be sufficient to sustain the decree. The rule as laid down in that case has been quoted with approval by this court in *Schmidt* v. *Schmidt,* 201 Ill. 191, *Scott* v. *Scott, supra,* and in the recent case of *Donelson* v. *East St. Louis*

*Railway Co.* 235 Ill. 625. Under the settled law of this State it is the duty of this court, in a case of this character, to review the facts on proper assignments of error, and where the verdict is against the manifest weight of the evidence the decree should be reversed.

There are some facts and circumstances in evidence to which we have not adverted, but the opinion has already been unduly extended. We are, however, satisfied that the verdict is against the great weight and preponderance of the evidence and should have been set aside by the court below.

There are other assignments of error which are not presented in the briefs of counsel, and therefore we do not pass upon them.

The decree is reversed and the cause remanded to the circuit court for further proceedings as to law and justice may appertain.                        *Reversed and remanded.*

FARMER, C. J., dissenting.