### DUBISKE v. COMMISSIONER OF INTERNAL REVENUE.

No. 4611.

Circuit Court of Appeals, Seventh Circuit.

April 6, 1932.

George I. Haight, of Chicago, Ill., Charles D. Hamel, of Washington, D. C., Irvin H. Fathchild, of Chicago, Ill., and Benjamin H. Saunders, of Washington, D. C., for petitioners.

G. A. Youngquist, Asst. Atty. Gen., and Sewell Key and A. G. Divet, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Eugene M. Meacham, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

SPARKS, Circuit Judge.

Pursuant to sections 1001–1003 of the Revenue Act of 1926, c. 27, 44 Stat. 9, 109, 110 (26 USCA §§ 1224 and note, 1225, 1226), petitioner seeks to review an order of the Board of Tax Appeals. The order redetermined deficiencies in petitioner's income taxes for the years 1920 and 1921, aggregating $202,526.50, which includes a fraud penalty of $67,508.84.

In 1917, H. W. Dubiske & Co., hereinafter referred to as Dubiske & Co., was in-

corporated by the efforts of petitioner. The authorized capital stock was $100,000, of which petitioner owned more than ninety per cent., and he was president and general manager. The business of the company was that of marketing industrial stocks at retail upon time payment plan, and it grew rapidly to quite large proportions, and its activities extended over many states. The sale methods employed by Dubiske & Co. were very expensive, and in some instances ran as high as $33.87 on each share of stock of the par value of $50. Among the stock issues sold by Dubiske & Co. were those of Metropolitan 5 to 50c Stores, Inc., which is referred to hereinafter as Metropolitan Company; Stevens-Duryea, Inc., and Dayton Rubber & Manufacturing Company, referred to hereinafter as Dayton Company.

In extending its activities, Dubiske & Co. encountered statutory restrictions in many of the states, which limited the maximum commission allowable to selling agents to 15 per cent. of the fair value of the stock. Accordingly, in July, 1919, said company's method of operation and system of accounting was modified in order to circumvent the effect of the statutes of those states which limited the commission.

Prior to the adoption of the modification, Dubiske & Co. purchased none of the stock of the issuing companies, but it sold the stock, both preferred and common, on a straight commission of 15 per cent., which was deducted and retained by Dubiske & Co. at the times of the sales, and one share of the preferred stock was sold with each share of the common stock.

Under the modified plan, the preferred stock was disposed of in the same manner as before, but the entire issue of the common stock was purchased outright by Dubiske & Co., and it was to be paid for by Dubiske & Co. only when and as it was sold to its customers and paid for by them. Before any stock of an issue was sold, Dubiske & Co. estimated the additional and contingent expenses in selling and making distribution of the particular issue. This estimate included commissions and compensation of petitioner and several other principal officers, outside brokers, expense of banquets, and all other miscellaneous items of expense which would or might arise. In recording such purchase of common stock the cost thereof was shown, not at the amount which Dubiske & Co. had agreed to pay the previous owners, but at an amount sufficient to cover the original cost plus the estimated additional expense. For this total amount a series of notes were executed by Dubiske & Co. to itself and were termed "escrow notes," but they bore no serial numbers, and were in no manner identified with any particular stock issue. They matured at various times ranging from thirty days to six months, and were indorsed by Dubiske & Co., and, upon failure to pay at maturity, they were renewed.

Such notes were recorded on the books of the company as the cost of such common stock and as the balancing liability therefor. They were not then delivered, but were held by Dubiske & Co. in its safety deposit box, to which petitioner at all times had access, and he was in sole charge and control of their delivery and payment. Said notes were to be delivered and paid only when and as the stock was sold and payment therefor was received by Dubiske & Co., and after 85 per cent. of the collections on preferred stock were accounted for to the issuing corporation. By this method the amount of unpaid notes in the deposit box should have always corresponded to the estimated cost of the unsold stock. If a portion of a particular stock remained unsold after the time limit in the contract had expired, an equivalent amount of notes recorded as the cost thereof was canceled.

After adoption of such accounting procedure in July, 1919, commissions and compensation of petitioner and several other principal officers and outside brokers and miscellaneous items of expense were not reflected upon the books directly as such disbursements, as before, but, being included in the predetermined cost of common stock, when such items became due a sufficient amount of said notes, for that purpose, were turned over to petitioner or his associates, and such person receiving the same would ordinarily deposit them for collection in his own bank and as a credit to his own account. If the obligation represented by such note or notes was owing to some person or persons other than petitioner or his associates, the person who had deposited the note or notes to his own credit would give his personal check to the party to whom this obligation was owing. In other words, all of the "escrow notes" which were paid by the company were cleared through petitioner or his associates, and a large part of all of them were cleared through petitioner, and the books of Dubiske & Co. showed such disbursements as payment of cost of escrow notes, and not as distribution expense. It was out of the preparation and use of said

"escrow notes" and the clearance of a large part of their proceeds through petitioner that the present controversy arose.

Petitioner has assigned error against the following rulings of the Board of Tax Appeals:

(1) That $350,000 withdrawn by petitioner in 1920, as proceeds of "escrow notes," most of which was disbursed as loans to Metropolitan Company, was income to petitioner.

(2) That $25,000 withdrawn by petitioner in 1920, and $75,000 in 1921, as proceeds of "escrow notes" and disbursed as loans to Stevens-Duryea, Inc., were income to petitioner.

(3) That out of "escrow note" proceeds withdrawn by petitioner in 1920 and disbursed to Hoyt and Little, petitioner realized income in the amount of $18,665.13.

(4) That for the year 1920, an item of $17,120 should be added to income of petitioner as profit on stock sold by him to Dubiske & Co.

(5) That petitioner fraudulently omitted the aforesaid items of income from his tax returns with intent to evade taxes.

(6) That petitioner's motion for a new trial be denied.

It is not denied that the first three items came into the hands of petitioner from Dubiske & Co., but petitioner claims that they did not come to him as income to himself but as funds of the company, to be disbursed by him as its agent. As to the fourth item, petitioner denies that he ever received it.

The Board's decision followed closely and relied upon the testimony of witness Eberhart, which, if true, generally supports the findings of the Board; but it is contended by petitioner that Eberhart was neither qualified nor competent as a witness, and that his credibility as such is impeached not only by other witnesses, including petitioner, but by physical facts which appear of record. This witness was an employee of Dubiske & Co. from 1918 to 1923, and sustained rather a close relationship to petitioner during that time, although he was at no time an officer of the company. His primary duty was to represent the company before securities commissions of the various states in which the companies did, or sought to do, business, and to prepare the company's applications for permits in accordance with the requirements of said commissions.

In relation to the item of $350,000, which was paid by Dubiske & Co. to petitioner, Eberhart testified that in the fall of 1920 Metropolitan Company, a client of Dubiske & Co., and whose stock Dubiske & Co. had sold or was selling, became financially embarrassed, and had sustained a loss during that year of about a half million dollars; that he and petitioner held a conference on that subject and determined that it was necessary, in order to save that company, for some one to advance money to it, because he and petitioner felt that if that company failed it would destroy the sale of its stock by Dubiske & Co.; that accordingly in the fall of 1920 he personally advanced to the Metropolitan Company the sum of $70,000, and in 1921 the additional sum of $26,000; that petitioner advanced to that company and for the same purpose a great deal more than the amounts so advanced by witness; that they both received notes for such sums advanced, which matured in three months, and additional notes were later issued to pay interest; and that finally bonds of the Metropolitan Company were exchanged for the notes. He further stated that he had no knowledge and had never heard of any reserve fund of $350,000 which petitioner testified was set up by Dubiske & Co. for the purpose of making loans to the Metropolitan Company, and out of which the money delivered by petitioner was advanced as agent for Dubiske & Co.

Petitioner also testified as to the bad financial condition of Metropolitan Company, and its immediate need for financial assistance. He further testified that Dubiske & Co., in order to create a reserve fund out of which said assistance might be rendered, delivered to petitioner, as its agent, escrow notes above referred to, and which were not yet due, to the amount of $350,000; that those notes were, in turn, paid by Dubiske & Co. to petitioner out of money in its possession which did not belong to Dubiske & Co., but belonged to its other client corporation; that the escrow notes so used were then canceled and the money thus received by petitioner was deposited in his personal bank account; and that out of that fund, on different dates in 1920 and 1921, he paid to Metropolitan Company, as loans from Dubiske & Co., the aggregate sum of $330,500 by his personal checks, and retained $19,500, which Dubiske & Co. then owed him, and with which he charged himself as "income" in his income tax return of 1921.

At each time Metropolitan Company received any part of the money so advanced to

it, it executed its note or notes, subject to renewal, for that particular amount, payable to itself within ninety days to four months. It then indorsed said note or notes and, according to the testimony of Mr. Crooks, its vice president, they were thereupon forwarded by mail to Dubiske & Co. It is only fair to say, however, that Mr. Crooks was the commercial and financial agent of the law firm in Chicago which represented Dubiske & Co., and he was sent to New York to look after the interest of Dubiske & Co. in Metropolitan Company. At the times of and after the advancements of money, and while he was vice president and later chairman of the board of directors of Metropolitan Company, many of the notes referred to were renewed from time to time and forwarded by mail to Dubiske & Co., as testified to by Crooks; and petitioner further testified that all of said notes when received were placed in the deposit box of Dubiske & Co., in place of escrow notes which were formerly taken therefrom in order to establish the reserve fund as referred to; and that the loans to Metropolitan Company were not noted on the records of Dubiske & Co., in order to conceal the fact that it had used other clients' money for that purpose.

It is not controverted that in 1921 petitioner caused the incorporation of Industrial Credits Corporation, the capital stock of which was issued in exchange for securities of seven or eight corporations previously financed by Dubiske & Co., including those of Metropolitan Company, Stevens-Duryea, Inc., and Dayton Company, which were then held, or claimed to be held, by Dubiske & Co. Frank H. Potter, an attorney for Dubiske & Co., was made president, manager, and a director of the new corporation, and he testified that all the stock, both common and preferred, was issued to him in trust for Dubiske & Co. without express written agreement, in order to conceal the identity of ownership, except ten shares which he owned; and that the notes of the Metropolitan Company were turned over by Dubiske & Co. in exchange for stock of the Industrial Corporation.

Conversations between petitioner and Eberhart bearing on the controversies now before us were testified to by both of them, and each generally denied what the other said.

A perusal of the entire record convinces us that the testimony of both Eberhart and the petitioner is unworthy of belief, unless supported by other material and reliable evidence. Unquestionably bad feeling existed between them at the time of the hearing, and the testimony of Eberhart is so inconsistent with and opposed to certain record evidence, to say nothing of the testimony of witnesses other than petitioner, as to render his uncorroborated testimony quite dangerous to rely upon, and indeed valueless under the instant state of facts. On the other hand, the accounting methods adopted by Dubiske & Co. at the suggestion and with the consent and connivance of petitioner with relation to that company's plan to circumvent and defraud the securities commissions of various states; his organization of Industrial Credits Corporation for the purpose of having it take over loans of certain investment corporations owned or controlled by him; his concealment from the public of the real ownership of the stock of that company; and his activities in having Dubiske & Co. create a reserve fund of $350,000 for the benefit of the Metropolitan Company, out of funds in the possession of Dubiske & Co. which did not belong to it, show such an utter lack of honesty and fair dealing as to render petitioner's unsupported testimony unworthy of belief.

With respect to the loans to Metropolitan Company, the testimony of no witness supports Eberhart, nor did he present his paid checks with relation thereto. Certain work sheets of a revenue agent were admitted for that purpose, but the Board, in discussing their weight as evidence in support of another similar item in the same proceeding and for the same year, rejected the government's claim therefor, and said that it was not clearly shown that the accountant referred to prepared petitioner's returns for the years in question, and that the burden of proof in that respect was upon the government, and it had failed to meet that burden satisfactorily to the Board. With that conclusion we agree, and we cannot accept the work sheets as corroborative of Eberhart's testimony.

Witnesses who testified on behalf of petitioner relative to the item now under discussion generally supported him, and their testimony was more or less of probative force; but it must be admitted that most of them were, or had been, more or less allied with petitioner in his business activities. There are certain facts of record, however, which have not been successfully contradicted and which seem to us to substantially support petitioner's testimony with respect to the item now under discussion. Dubiske & Co., at the time the reserve fund is al-

leged to have been established, did not owe petitioner the amount of said alleged fund, or any sum approximating that amount. The original notes executed by Metropolitan Company for the loans were, according to the representative of that company, mailed to Dubiske & Co., and all renewals thereof were likewise mailed to it, and when said debts were transferred to Industrial Credits Corporation the renewals were likewise delivered to that corporation. When any of said notes were paid, either by cash or renewal, they were stamped "Paid" by the corporation which held them, and returned to the maker. There were nine of such notes, totaling $133,500, stamped "Paid" by Dubiske & Co., and nineteen notes, which totaled $215,000, stamped by Industrial Credits Corporation, found in the possession of Metropolitan Company, the photostats of which are contained in the record, and these were all the notes bearing on the transaction that could be found. Under these circumstances, we think there is no material evidence in the record which supports this item.

With relation to item two, it is admitted that of the proceeds of the escrow notes passing from Dubiske & Co. to petitioner, the amounts of $25,000 in 1920 and $75,000 in 1921 were disbursed by petitioner as loans to Stevens-Duryea, Inc., and the question presented is whether they were loans of Dubiske & Co., or petitioner's individual loans.

Again the government relies largely upon the testimony of Eberhart and the accountant's work sheets to sustain its contention. What was said by us concerning his testimony in relation to the Metropolitan loans, and with relation to the work sheets, is equally applicable to this item. It is significant, however, that while Eberhart testified that he and petitioner, as individuals, made these loans to Stevens-Duryea, Inc., and that they furnished the money, yet immediately following that statement he said that he could answer only so far as he was concerned.

In support of petitioner's evidence, the record shows that Stevens-Duryea, Inc., regarded said loans as those of Dubiske & Co. and they were so treated on the books of the former company, and its records showed no loan whatever from Eberhart. The secretary of that company, who was also its treasurer and a director, testified with relation to these loans as follows: "* * * We paid interest on those loans. I handled that. The interest was paid to Dubiske &

Company. I am positive about that. I recall sending the interest checks; in fact, I know I signed all the interest checks." These facts support petitioner's testimony, and we are convinced there is no substantial evidence in the record to support respondent's claim as to this item.

With relation to the third item of respondent's claim, it is not denied that petitioner received from Dubiske & Co. $150,000 as proceeds of certain of the escrow notes which he paid directly or indirectly to Central Bond & Mortgage Company, hereinafter referred to as Central Company, and it is admitted that Hoyt and Little were agents of that company, and as such agents participated in the transactions relative to the item in question. The Board found that the entire amount of this money so received by petitioner from Dubiske & Co. and paid to Central Company was owned in equal proportions by petitioner and Eberhart, and that they, as individuals, paid it to Central Company, and the Board therefore charged one-half of that amount, less certain credit deductions, as income to petitioner.

This finding is almost entirely based upon the testimony of Eberhart. He testified that he and petitioner, as individuals, and in equal proportions, paid this $150,000 to Central Company, and that he paid his part of it by his personal checks, but he produced no such checks in verification of that statement. He also stated that, of the entire amount so paid by himself and petitioner, $95,000 was commission to Central Company for services rendered by it in connection with Dubiske & Co. in marketing the stock issue of Dayton Company, and that $55,000 was for certain stock of Dayton Company then held by Central Company, which Central Company then transferred to himself and petitioner in equal proportions.

On the other hand, petitioner testified that the entire amount of $150,000 was for a commission due Central Company for its services relative to the sale of Dayton Company stock, which Dubiske & Co. had agreed to pay out of the proceeds of the sales of said stock; and that Eberhart paid no part of it, but that petitioner paid the entire amount for and on behalf of Dubiske & Co. out of the $150,000 which he had received for that purpose from the proceeds of the escrow notes.

We find only one circumstance in the record which materially tends to support Eberhart's testimony, and that is the fact that on August 10, 1920, Hoyt and Little

entered into a written contract with Dubiske and Eberhart, which is set forth in the margin.[1]

It is not denied that in making this contract Hoyt and Little were acting as agents for Central Company, and that company admits receipt of the consideration therein named.

A perusal of the record with relation to this particular item only confirms our opinion that the testimony of Eberhart and petitioner is unworthy of credit unless corroborated by other evidence, and the following facts of record are quite convincing in support of petitioner's contention:

It is not denied that Central Company, through its agents, Hoyt and Little, solicited and secured the aid of Dubiske & Co. in marketing the stock issue of its client, Dayton Company; and for its services relative thereto, which included bringing the business to Dubiske & Co., Central Company was to receive a commission. Whether at that time the exact amount of commission was agreed upon the record is not clear, but prior to the time the contract of August 10 was entered into Central Company had received $25,000 on the personal check of petitioner, and al-

so certain stock of the Dayton Company, or the right to receive such stock, all as part payment of its commission, and the balance of the commission was not yet due. Witness Garey, the attorney for agents Hoyt and Little, testified that he was present and participated in the transactions leading up to and including the execution of the contract; and that Central Company needed cash, and that it thereby agreed to accept $150,000 in full payment of its commission and to transfer and turn over to petitioner and Eberhart whatever it had already received, and whatever might yet be due it, as commission. He did not know whether petitioner and Eberhart, in the execution of the contract, acted individually or as agents for Dubiske & Co.

The further fact appears of record that Central Company regarded the entire amount received as commission and profit, and so charged itself in its income return to the government.

The payments of this item to Central Company consist of five personal checks of petitioner. The dates, names of payees, and amounts are as follows:

August 2, 1920 Dubiske & Company .....................$25,000.00
August 10, 1920 Central Company ...................... 50,000.00
August 31, 1920 Dubiske & Company ..................... 12,536.45

---

[1] This agreement made and entered into this tenth day of August, 1920, by and between C. B. Little and J. M. Hoyt, parties of the first part, and H. W. Dubiske and A. O. Eberhart, parties of the second part, Witnesseth:

That said first parties in consideration of the sum of One Hundred Fifty Thousand Dollars, to be paid as hereinafter stated do by these presents sell, assign, transfer and set over to said second parties all their right, title and interest in and to the following:

1. 1102 shares of the Class A Common stock of the Dayton Rubber Manufacturing Company as evidenced by stock certificates numbered C5320, C5321, C5322.

2. 13,357 shares of the Class B Common Stock of the Dayton Rubber Manufacturing Company as evidenced by stock certificates numbered C37, C43, C44, and C45, said Class B Common Stock certificates being subject to an escrow agreement which second parties accept and assume.

3. All the right, title and interest of the said first parties in and to certain proceeds from the sale of all the Class A Common stock of the Dayton Rubber Manufacturing Company sold by H. W. Dubiske & Company, said proceeds amounting in all to $95,000 and payable as collected from the proceeds of such sales.

4. All the right, title and interest of said first parties in and to the proposal of John A. MacMillan and C. E. Hooven dated December 3rd, 1919, and accepted by said first parties and H. W. Dubiske & Company, together with the agreement between said J. A. MacMillan, C. E. Hooven said first parties, and H. W. Dubiske & Company, dated December 3, 1919, and the statement, marked "Exhibit A" thereto attached, as well as the Declaration of Trust executed by said J. A. MacMillan and C. E. Hooven in accordance with said agreement and bearing same date.

It is the express intent and purpose of this agreement to convey to said second parties all the right, title and interest in and to the profits now derived and hereafter to be derived from the entire refinancing operations of the Dayton Rubber Manufacturing Company entered into on or about December 3, 1919.

The payments under this contract are to be made as follows:

$75,000 at the time of the execution of this agreement, the receipt whereof is hereby acknowledged, $12,500 on or before fifteen days thereafter, $12,500 on or before thirty days thereafter, $20,000 on or before sixty days thereafter, and the remaining $30,000 on or before ninety days thereafter, said future payments to be evidenced by promissory notes executed by said second parties to said first parties bearing even date herewith and interest at the rate of 7% per annum.

It is also agreed that said second parties hereby release and forever discharge said first parties and the Central Bond & Mortgage Company, a corporation of Chicago, Illinois, from any and all claims, said second parties and H. W. Dubiske & Company now have or hereafter may have against said first parties and against said Central Bond and Mortgage Company by reason of the execution of any and all agreements herein mentioned and said second parties hereby also agree to discharge any and all of the obligations of said first parties to be by them performed thereunder.

This agreement shall be binding on the heirs, executors, administrators and assigns of the respective parties hereto.

C. B. Little [Signed]
J. M. Hoyt [Signed]
First Parties.

H. W. Dubiske [Signed]
A. O. Eberhart [Signed]
Second Parties.

September 9, 1920 Central Company .......................... 12,572.91
September 18, 1920 A. O. Eberhart .......................... 49,872.96

These checks were all indorsed by the respective payees, received by Central Company, and credited by it on the commission of $150,000. Eberhart, when shown the last-mentioned check, said he received it and deposited it in his own bank account, and then gave his personal check to Central Company, but when his attention was called to the indorsements thereon he admitted he was in error and that it did not pass through his bank account.

It is also worthy of note that in certain correspondence of Eberhart, with relation to the presentation of the affairs of Dubiske & Co. before the Internal Revenue Department, which was seeking to ascertain the actual cost of stock which Dubiske & Co. had sold, he refers to the item now under discussion as one of expense, and as paid by Dubiske & Co. to Hoyt and Little; but in making his own tax return to the government he treated one-half of said amount as payment by himself to Hoyt and Little, and on that theory claimed a deduction for it. He swore to that return, and at that time he could produce no checks, but he submitted the contract of August 10 in evidence to support his sworn statement.

Respondent's Exhibit C is a protest and answer of petitioner to government's claim for additional income taxes for 1920, and it was filed with the Commissioner of Internal Revenue on July 6, 1926. It contains a grand summary of the distribution or collection by recipients, for the years 1919 to 1923, inclusive, of the escrow notes relating to all stock issue transactions. Among other things, it shows the total amount received each year by petitioner, and also the amount received each year by Eberhart, who admitted its correctness so far as the payments to him were concerned. The same summary shows that in the year 1920 Hoyt and Little were paid $150,000 in relation to Dayton Company stock issues, and if any part of that amount was paid to Eberhart the other figures which he verified could not be correct. We assume that these figures were verified by respondent, and there is nothing in the record to contradict them. We are convinced that there is no substantial evidence in the record to support this item.

The last item which is controverted by petitioner relates to a charge of $17,120, which admittedly was a profit received by petitioner in 1920 as the result of a sale by petitioner to Dubiske & Co. of 3,611 shares of Dayton Company stock. The opinion of the Board with relation thereto contains the following: "It is our opinion that the amount of $17,120 was received by the petitioner but we are unable to determine whether or not the respondent has already taken this into account in his determination. * * * The amount of $17,120 will be included in the petitioner's income if it has not already been taken into account by the respondent."

The findings of the Board clearly state that petitioner charged himself with this item in his income tax return for the year 1920, as shown in Schedule D of that return. It is obvious, therefore, that he should not be charged with it now as a deficiency. We are not unmindful of the presumption of correctness as to findings of fact by the Board, but where that finding is based on the uncorroborated testimony of a witness whose credibility is not only rendered unreliable by his own statements, but is also contradicted as to material matters by other witnesses, not including petitioner, and by undisputed physical facts, we think the presumption should not obtain. Illinois Central Railroad Co. v. Long (Ky.) 128 S. W. 890; Slam v. Lake Superior Terminal & Transfer R. Co., 152 Wis. 426, 140 N. W. 30; Drum v. Capps, 240 Ill. 524, 88 N. E. 1020.

The order of the Board of Tax Appeals is reversed.