ALICE LOUBY *et al.* Defendants in Error, *vs.* GEORGE KEY, Plaintiff in Error.

*Opinion filed April 19, 1913—Rehearing denied June 5, 1913.*

1. WILLS—*an insane delusion is a belief in something in the existence of which no rational person would believe.* While it is difficult to define an insane delusion such as renders a person incapable of making a will, yet in its simplest form such a delusion may be defined as a belief in a state or condition of things in the existence of which no rational person would believe.

2. SAME—*when a decree overthrowing alleged will will be affirmed.* A decree finding, in accordance with the verdict, that the instrument in question was not the will of the testatrix will be affirmed, where the evidence tends strongly to show that the testatrix was not only of unsound mind generally, but also that she was under an insane delusion that her mother and sisters were of no blood relation to her.

3. APPEALS AND ERRORS—*when alleged error in instruction will not be considered.* Alleged error in an instruction will not be considered by a court of review where such error was not urged in the motion for new trial, which purported to set out in detail the errors relied upon.

WRIT OF ERROR to the Circuit Court of Clinton county; the Hon. JAMES C. MCBRIDE, Judge, presiding.

TRAUTMANN, FLANNIGEN, BAXTER & HAMLIN, and FORD & JONES, for plaintiff in error.

WEBB & WEBB, and MURRAY & MURRAY, (WILLIAM JOHNSTON, guardian *ad litem,*) for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is a bill filed in the circuit court of Clinton county by defendants in error to set aside the alleged will of Olive Blumberg-Crews, deceased, on the ground that she was of unsound mind and under undue influence at the time it was executed. The jury found that the document in question

was not her will, and also found, in answer to special interrogatories, that she was of unsound mind and subject to undue influence at the time it was executed. Plaintiff in error brings the case to this court for review.

Olive Blumberg-Crews (or, as she is usually called in the record, Olive Blumberg,) was at the time the purported will was executed about thirty-four years of age. She was born in Marion county, Illinois, and lived much of her early life at Huey, in Clinton county. During her later life she resided for several years at East St. Louis, staying temporarily several times in St. Louis. In the early part of September, 1911, she went to visit an acquaintance in St. Louis, and on September 14, on the advice of a physician, was taken to the Baptist Hospital in that city for an operation for ulcer of the stomach. She was operated upon on September 17 and a portion of the diseased organ removed. The will was executed September 27, her death occurring October 8, 1911. When quite young she married one John Reithman. After his death she married Amos Blumberg, a pawnbroker in East St. Louis. At his death, in June, 1904, he left her considerable property, which formed the bulk of that disposed of by the will here in question. The real estate was worth from $13,000 to $15,000 and the personal property from $1500 to $2500. In January, 1907, she married Arthur Crews, who died less than a year thereafter. She had, however, separated from him before his death. She left no children or descendants of children, and her surviving relatives are her mother, two sisters, one half-brother and three half-sisters. Her will provided, in substance, that $150 should be paid to her mother and step-father and an annuity of $25 a month to them so long as they might live and after the death of either to be paid to the survivor, with a contingent bequest, after their death, to one of her sisters. After a bequest of one dollar, each, to certain other relatives, all the rest and residue of the property, of every nature, was given to plain-

tiff in error, George Key, of East St. Louis, who was appointed executor of the will without bond. He was not related to her in any way, but she stated to some of the hospital attendants that she intended to marry him. The testimony tends to show that Key had the will prepared at the request of the deceased; that on the day it was executed he brought it to the hospital and asked Dr. Morris, the superintendent, and Ina Bram, the house superintendent, to sign it as witnesses. The only persons present at the time it was executed were Key, the two witnesses and the testatrix. There were one hundred beds in the hospital, and the two witnesses had no occasion to be brought in special contact with the testatrix, either before or after the will was executed, while she was at the hospital. They both testified that Dr. Morris, when the will was handed to him by Key, read it over to her and asked her if that was what she wanted, and she replied it was, and that she was mentally clear and there was no evidence of any restraint or undue influence. All of the attendants at the hospital who testified, stated that so far as they had seen or heard anything at that institution they thought that she was of sound mind. The testimony tends to show that for several years before her death she used intoxicating liquors excessively and had taken morphine and other opiates.

In this as in most will contests there is a sharp conflict of testimony as to the mental capacity of the testatrix, a number of witnesses testifying that they had talked or done business with her in the few years previous to her death and that they thought her capable of transacting business and of sound mind, other witnesses testifying just as positively that she was of unsound mind. We think the weight of the evidence is, that when under the influence of morphine or other opiates she was incompetent to transact business, and that she was under such influence considerable portions of the time. During the last few years she frequently used very vulgar and obscene language, and would appear in the

hallway of the house where she was rooming, or even on the street, only partially dressed and so clad as to expose her person. It is claimed by counsel for plaintiff in error that the testimony tends to show this was only when she was under the influence of opiates. Several physicians who had treated her before she went to St. Louis for the operation testified they thought she was of unsound mind, and several other physicians testified that when she was not under the influence of opiates she was of sound mind and capable of transacting business. After she acquired her property from her husband there is testimony tending to show that at different times she offered to leave all of her property at least to three different persons. She made her will naming as chief beneficiary Mrs. Anderson, with whom she was stopping. She also offered to leave her property to a Mrs. Landon, and a few days before she went to the hospital, while at the home of Mrs. Martin, she offered to draw a will in favor of Mrs. Martin as chief beneficiary. She also offered her diamonds, which were of considerable value, to several persons as a gift. She was apparently infatuated with one of the physicians who attended her and wanted to marry him. While at the home of Mrs. Martin a week before she was taken to the hospital in St. Louis she heard that he was married and was greatly excited over it and said she did not care to live, and claimed at different times that she was engaged to marry him. There is no evidence in the record tending to show that he paid her any attention other than in treating her as a physician, and one or more times when she wanted him to remain in the room with her alone he refused. A witness testified that on the evening when the body of the testatrix was sent to her old home for burial Key attended the theater, and another witness testified that she met him a week after the death of the testatrix and asked him why, when Mrs. Blumberg was so sick, he had not procured a license and married her before she died and then they could not take the money away

258 - 36

from him, and that he replied, "Oh, no! She might not have went; she might have got well." She was the daughter of Sylvanus and Alice Reinhardt, now Mrs. Louby. Her father died when she was a young child, and a few years later her mother married a man by the name of Thomas (or Timothy) Louby. During the later years of her life she told many people that she was educated in a convent and had no lawful parents; that she had foster parents; that they were very poor and that she had been providing for them. At other times she stated that her mother was an Indian woman, her father a traveling man, and she was born in an alley. She stated these things to one or more of the doctors who treated her during her last illness and to some of the attendants at the hospital when she was talking of drawing her will in favor of Key, and when she was suggesting drawing a will previous to that in favor of other people she seemed desirous not to leave her property so that her foster parents (as she called them) would have it all. There is not the slightest evidence in the record that there is any foundation for this belief as to her parentage. Her grandmother testified that she was present at her birth and never heard any rumors or anybody talking about anything of this kind until after the death of the testatrix. This testimony was corroborated by several residents of Clinton county who had known the testatrix from her early childhood. In this connection it may be noted that her will does not refer to any of her relatives as such, but merely designates them by their names. From the will, alone, one would obtain no information as to the relations of any of the parties designated as beneficiaries. Several of the people whom she told she had no parents and who did not know her in her early life believed her statements in this regard and were surprised to learn the contrary.

An insane delusion which will render one incapable of making a will is difficult to define. In its simplest form a

delusion may be said to be a belief in a state or condition of things in the existence of which no rational person would believe. (*Schneider* v. *Manning,* 121 Ill. 376; *Snell* v. *Weldon,* 243 id. 496.) In the case last cited it was held that proof that the testator believed certain things regarding his only surviving son, having no evidence upon which to base such belief, was sufficient, on the facts in that case, to establish an insane delusion. Without attempting to set out at length all the details of the evidence with reference to the mental unsoundness of Mrs. Blumberg, we have reached the conclusion, from an examination of the record, that the weight of the testimony supports the conclusion that the testatrix was laboring under an insane delusion in regard to her mother and brothers and sisters, who were the natural objects of her bounty, and that the existence of such delusion influenced her in making the will. There is also other evidence in the record tending strongly to support the finding of the jury that the testatrix was mentally unsound at the time she executed the will. It is the rule in will contests that the finding of the jury, unless clearly against the weight of the evidence, is conclusive. *Hurley* v. *Caldwell,* 244 Ill. 448; *Smith* v. *Henline,* 174 id. 184.

The conclusion on the question of mental unsoundness is such that we are not required in this opinion to discuss the question of undue influence. It is not improper to say there was sufficient evidence in the record on this point to justify submitting that issue to the jury.

Counsel for plaintiff in error further insist that the court erred in giving and refusing instructions. The alleged error as to one of the instructions in question was not raised in the written motion for a new trial, although that motion purported to set out in detail the errors relied on. Under such circumstances the alleged error cannot be urged here. (*Consolidated Coal Co.* v. *Schaefer,* 135 Ill. 210; *Lasher* v. *Colton,* 225 id. 234.) Another instruction

concerning unsoundness of mind was properly refused because it ignored the question of undue influence and as worded might have misled the jury. We have examined all of the questions raised and do not think any reversible error was committed in the giving, refusing or modification of instructions. Taking all the given instructions together, we think the jury were fairly instructed on the law of the case as applied to the facts presented on the record.

The decree of the circuit court will be affirmed.

*Decree affirmed.*