(No. 22626.—

SUSAN R. EUBANKS *et al.* Appellees, *vs.* JOHN H. EUBANKS, Appellant.

*Opinion filed April 12, 1935.*

HERRICK, J., took no part.

WIRT HERRICK, CARL I. GLASGOW, and B. E. MORGAN, for appellant.

J. L. HICKS, and E. J. HAWBAKER, for appellees.

Mr. Justice Orr delivered the opinion of the court:

John H. Eubanks brings this appeal from a decree of the circuit court of Piatt county setting aside a deed and other purported gifts to him from his deceased father, Garland B. Eubanks. The decree declared the deed void and annulled the purported gifts of personalty on the ground that deceased was mentally incompetent, that the property was obtained by undue influence and by virtue of a fiduciary relationship existing between deceased and his son John, and that the purported gifts of personalty were also in fraud of the marital rights of the widow. The bill was amended and supplemented and issues were joined by answers.

Garland B. Eubanks died intestate October 4, 1931, in DeLand, Illinois, at the age of about eighty-three years. Surviving him were his widow, Susan R. Eubanks, his sons, John H. and Charles, and his daughters, Ada Lewis, Lona West and Frances Summers. On March 28, 1931, about six months before his death, he executed a deed conveying to his son John all of his real estate in DeLand, consisting of five lots, which were improved by three residence buildings. Within a year of his death deceased also sought to make gifts to his son John of his personal property, consisting of between $4000 and $5000 in cash or certificates of deposit. On September 1, 1932, the widow, the daughters Lona West and Ada Lewis, the son Charles, and Elmer West, as administrator of deceased's estate, appellees herein, filed their bill of complaint in the circuit court of Piatt county against the son John, the appellant, his attorney, W. A. Doss, who is alleged to have received from John most of the personal property, the daughter Frances Summers, and Mary Brobent, who was a tenant in possession of a portion of the real estate.

The record is voluminous and the testimony is in many respects conflicting. Garland B. Eubanks and Susan R.

Eubanks were married in August, 1873. Apparently at that time he was twenty-five and she was fifteen years of age. They moved to DeLand in 1884. Deceased conducted a draying business there for about twelve years. His wife took in washing and acted as a practical nurse. Shortly before 1922 she also assisted in preparing deceased women for burial. In about five cases of this kind she was called upon for assistance by the local undertaker, G. W. Trigg, who is now deceased and whose relations with the wife have a bearing upon one of the issues here. Deceased and his wife were industrious and frugal and as a result acquired the real estate in question. In 1913 they went to Iowa, where they farmed rented land for about five years. Their efforts met success and they returned to DeLand in 1918 with about $8000. Apparently there was a rift between them while they were in Iowa but after their return to DeLand they seemed for a few years to live happily together. However, the evidence indicates that deceased became quite penurious, kept most of his money on his person, and gave his wife little, if anything, for her support and the support of their children. In consequence she was compelled to obtain such work as she could to earn a livelihood. She attended the sick, took care of confinement cases and did housecleaning for others, and in this way was able to support herself and her children.

In the latter part of 1920 deceased counsulted Ira J. Scott, an attorney in Ames, Iowa, about making a will. He indicated to this attorney that he had $7000, told him to deduct $2000, to divide the remaining $5000 into seven parts so that one share would be $714.30, and that he wanted to give $500 each to his widow and his children Apelona West, Frances Summers and Charles E. Eubanks and $1000 each to his children John H. Eubanks and Ada Lewis. He did not indicate what he intended to do with the remainder of his personalty and said nothing about his real estate. The attorney stated he would write the will

when deceased would pay him a fee of five dollars, but this was never paid and the will was not drawn.

Some time in 1922 deceased conceived the idea that his wife was unfaithful to him—that her relations with the local undertaker, Trigg, were, and had been, improper. At that time deceased was seventy-four and his wife about sixty-four years of age. They had been married forty-nine years, had six children, numerous grandchildren and some great-grandchildren. On September 14, 1922, deceased called to his home a local banker, who prepared the following instrument in longhand:

"This agreement made 14th day of September, A. D. 1922, by and between G. B. Eubanks and Susan Eubanks, husband and wife of DeLand, Illinois, G. B. Eubanks being the first party and Susan Eubanks the second party.

"It is hereby agreed and understood by both parties that they separate and divide their property as follows: It is mutually agreed that the first party have lots 8, 9 and 12 and the south half of 11 in block 15, DeLand, Illinois as his share of their real estate in DeLand, Illinois, and the second party to have lot 10 and the north half of 11 block 15 DeLand, Illinois as her share of all of his property.

"When first party disposes of his share of said property the second party agrees to sign a warranty deed with him to all of his real estate in consideration of which the first party agrees to deliver to second party a warranty deed for her share of lot 10 and north half of 11, block 15, DeLand, Ill.

G. B. Eubanks,<br>Susan (X) Eubanks.

E. T. McMillen, witness to mark."        (Her mark)

The instrument was duly acknowledged before E. T. McMillen, notary public, who testified that he wrote it at the home of deceased and at his request; that he had no conversation with the wife about signing it; that he read it to both of them; that deceased then signed it; that McMillen wrote the words "Susan Eubanks, her mark," and that the wife made the mark between those words. The wife was unable to read longhand writing and was more

or less illiterate and uneducated. She testified that she did not sign this instrument; that when she was asked to sign it she refused because she saw no need for it; that she did not know the significance of a signature by mark and that no explanation was given her in this respect. She also testified that before McMillen's arrival at her home her husband told her McMillen was coming with a paper which would protect her, because he "was afraid the children might take something away," but that she replied she had no such fears. She also testified that for three or four weeks afterwards she and her husband slept in the same bed. Shortly thereafter he left in his automobile for Ames, Iowa, taking some bedclothes and cooking utensils with him. After 1922 deceased at no time contributed to the support of his wife. From then until about 1927 he occupied two rooms in a residence in Ames which he owned jointly with his son John. During a part of that period his son John, with his family, occupied the remainder of the house. The two men made frequent long trips together in the automobile to various other States, especially Florida. Occasionally they returned to DeLand and visited friends, and on those occasions deceased lived in one of his own houses other than the one occupied by his wife. While at such time she cooked his food and waited upon him they never again lived together.

On November 8, 1927, deceased again consulted attorney Scott at Ames, this time for the purpose of having him prepare a deed, to be signed by his son John and the latter's wife, conveying to deceased the residence property in Ames which he and the son had previously owned jointly. The attorney prepared the deed and received his fee from deceased. The deed, as recorded, named John and his wife as grantors but was signed only by John's wife. Nevertheless the attorney, who acted as the notary, certified that both John and his wife had signed and acknowledged the deed. This attorney later was employed as an attorney by

the son John. He testified that he was unable to explain why he certified on the deed to John's acknowledgment, nor was he able to recall to whom the deed was delivered, by whom it was recorded or what became of the original deed, which was not produced in this case. The evidence indicates that deceased assumed that the deed conveyed to him all the interest of the son John and his wife, for he thereafter acted as though he were the sole owner, insured the dwelling in his sole name, rented the premises, collected the rents, and refused to permit John and the latter's son-in-law to live in the house.

On November 24, 1929, the wife filed her bill for divorce and alimony against deceased in the circuit court of Piatt county, alleging that about seven years before he had deserted her. The summons in that case was personally served upon deceased December 6, 1929. Thereafter deceased paid no taxes on the real estate in question but permitted it to be sold for taxes to defendant W. A. Doss, who was attorney for deceased and his son John. The wife redeemed the property from the tax sale and has since paid all taxes. On January 6, 1930, deceased, through attorney Doss, filed his answer to the bill for divorce, denying that he had deserted his wife seven years before but asserting that on or about September 14, 1922, his wife became "infatuated with a certain other man in DeLand" and persisted in making unnecessary visits with that man despite deceased's displeasure and protests; that they quarreled and deceased's life became miserable; that they mutually arranged to submit their difficulties to their friend McMillen, who prepared for them the instrument above shown; that pursuant to this agreement the parties by mutual consent separated and thereafter lived apart from each other, and that decesead was broken down in health and not able to share any more of his property with his wife than he had done by the instrument. The wife filed her motion for temporary alimony, fees and costs, supported

by her affidavit that she was seventy-seven years of age, in poor health and unable to work for wages; that deceased had not contributed anything to her support for the past seven years, and that, although he was well able to provide for her support, he had refused to do so. Later she filed her amended bill for divorce, asserting that in 1922, when she was unable to read or write, deceased employed McMillen to prepare the instrument of September 14, 1922, and directed her to sign it, which she did by her mark; that she did not know or understand the nature or effect of the writing and acted under compulsion of deceased, and that she received no consideration from him. The answer of deceased to the amended bill was substantially like his original answer, and in addition asserted the fairness of the purported division of his property between himself and wife. Two weeks later, on October 24, 1930, within a year of the filing of the bill for divorce and alimony, deceased and his son John went to a bank in Ames, where John signed and delivered to the bank the following instrument:

"UNION NATIONAL BANK, AMES, IOWA.    *"October 24, 1930.*

"*Gentlemen:* You are hereby authorized to honor checks drawn on your bank signed by G. B. Eubanks, and charge checks so signed against my account. . It being my instructions that G. B. Eubanks shall have the authority to sign checks on your bank for part or all of any money on deposit in your bank in my name until this order is canceled.

"It is also my instructions that you shall not honor checks against me on deposit in your bank signed by myself until after the death of G. B. Eubanks. It being my intention and instructions that all money on deposit in this bank in my name shall be under the control of G. B. Eubanks, and that I shall have no control of the withdrawal of any part of money on deposit in the Union National Bank in my name until after the death of G. B. Eubanks.

"Dated this 28th day of October, A. D. 1930.

JOHN H. EUBANKS."

The record does not indicate how much, if any, money was on deposit in John's name at that time. His check-

ing account at the bank apparently commenced in October, 1931, and ended February 8, 1932. It indicates that the principal transactions of deceased and his son with the bank involved time certificates of deposit. On October 31, 1930, the bank issued two time certificates of deposit in the name of John Eubanks for $750 each, which were cashed May 8, 1931. These certificates bear the endorsement only of "G. B. Eubanks" and so were apparently cashed by him, notwithstanding the fact they were issued in the name of his son John. On March 21, 1931, another certificate was so issued for $1500 and was cashed August 6, 1931, The evidence indicates the moneys so deposited, and others later deposited, were furnished by deceased to his son apparently in pursuance of the letter of October 24, 1930, by virtue of which deceased reserved the right to retain control of the funds until his death. On March 21, 1931, in connection with the deposit of that date, deceased signed and delivered to the bank a letter addressed to it, as follows: "You have this day issued your time certificate of deposit No. 31030 for $1500 to John H. Eubanks, and the same is under my control as long as I live. Therefore, you are instructed in case of my death to pay from this certificate my funeral expenses and a monument to cost not more than $500, and the balance, if any, to go to John H. Eubanks."

On motion of deceased, supported by his physician's affidavit that he was "afflicted with high blood-pressure and had heart trouble," "largely due to senile condition," and that in the opinion of the physician, based upon these physical conditions, deceased "cannot have a reasonable regard for his life and safety of his health in making a trip at this time from Ames, Iowa, to Monticello, Illinois," the divorce case was continued to the June term and later set for trial July 3, 1931. It was never tried. On March 25, 1931, at the time they were in the office of attorney Scott, in Ames, preparing the affidavit to support the motion for

continuance in the divorce case, deceased and his son John discussed with the attorney the preparation of a deed by deceased to John conveying to the latter the five lots in DeLand. They discussed whether the deed should recite a consideration of one dollar and love and affection, but it was finally decided it would be best to show a consideration of about the value of the property, $1500. By arrangement then made deceased and John went to the bank in Ames. Deceased gave John $1500, which the latter deposited. John then drew a check payable to his father for the same amount, which was cashed two days later. The deed prepared by the attorney reciting a consideration of $1500 was signed and duly acknowledged by deceased. It was delivered by John to the county recorder of Piatt county and recorded April 18, 1931. After it had been recorded, the deed was, in accordance with John's directions to the recorder, mailed by the recorder to John, addressed to him at DeLand, but he testified he never received it and has not seen it since he delivered it to the recorder. A certified copy was introduced as an exhibit in this case.

The records of the bank show that on March 23, 1931, a deposit of $1500 was made and a time certificate of deposit issued in the name of John. This certificate was cashed August 6, 1931. Meanwhile, deceased for some considerable time had been carrying on his person in a money belt $3300 in cash. The records of the bank disclose that on July 21, 1931, $4230 was deposited in the bank and five certificates issued in the name of John, four for $1000 each and another for $230. On August 6, 1931, the following certificates which had been issued in John's name were cashed: One dated March 3, 1931, for $1500, one dated July 21, 1931, for $1000, and another of the same date for $230.

On September 14, 1931, deceased sent a telegram from DeLand to the bank in Ames as follows: "Don't pay John

Eubanks any more money in checks of any kind." The next day John wrote to the bank, enclosing the certificate of deposit for $230, asking the bank to pay the taxes on deceased's property, apparently in Ames, and to send the latter a draft for the balance. On September 18 the bank wrote John, quoted his father's telegram of the 14th, and requested a letter signed by deceased consenting to the cashing of the certificate and the disposition of the proceeds. Under date of September 21 a letter purporting to be signed by deceased and bearing the name of his daughter Mrs. Elmer West as a witness to the signature was sent to the bank, stating: "Please pay the taxes and send me the balance of the money to me out of the certificate that was sent to you. *He* sent you that telegram to you thinking I was going to try to cash them." Confusion is caused not only by the letter itself but also by the testimony, as to whether this letter was signed by deceased or whether it was not only prepared but also signed by John. The evidence shows that John prepared the letter and indicates that deceased did not sign it. Mrs. West, the witness to the signature, testified her father did not sign the letter. The bank paid the taxes, amounting to $32.66, and sent a cashier's check for the balance to deceased.

On September 11, 1931, Elmer West, a son-in-law of deceased, filed a petition in the county court of Piatt county for the appointment of a conservator for deceased, alleging that the latter was of unsound mind and incapable of managing and caring for his own estate and asking the appointment of his wife as conservator. On September 26, 1931, a jury rendered a verdict finding the facts alleged in the petition to be true, and on the same day letters of conservatorship were issued to Elmer West. Meanwhile, about July 20, 1931, the wife learned that deceased was quite ill and she left immediately to be with him. She stayed at the house in Ames with him and their son John until August 4, when he was so ill that he was taken to

his home in DeLand, where, after a lingering illness, he died two months later.

A day or two before his father's death John left De-Land and went to Ames, apparently for the purpose of making arrangements for obtaining the moneys in the bank account and cashing the certificates of deposit. John ultimately received amounts aggregating approximately $4500, and of this he paid out about $800 for funeral expenses, the erection of a monument and other minor disbursements. The remainder he turned over to his attorney, W. A. Doss, who thereupon signed and delivered his two judgment notes payable to John H. Eubanks, one dated January 26, 1932, for $3060, and the other dated February 3, 1932, for $690, both due March 1, 1932, and each providing on its face, "This note is non-negotiable." The purpose of these transactions is not clearly disclosed by the record. The answer filed by John to the original bill asserts simply that John turned the moneys over to his attorney and received his notes for the same.

In his answer to the original bill John asserted absolute ownership of the real estate and the moneys without any qualification. In his answer to the amended bill John denied that the conveyance of the real estate and the turning over to him of the personalty was in trust for the purpose of holding the same and thereafter making a just and equitable division among his brothers and sisters. He asserted, on the contrary, an understanding between his father and himself to the effect that both the real estate and moneys (except $1500 which was apparently to be used to pay burial expenses and the cost of a monument) were to be John's "own property in fee simple, both as to the real estate and as to the moneys, excepting that John H. Eubanks was intrusted, not as a matter of law but merely as a matter of faith and confidence that he would see to it that Elmer West, Lona West and Susan R. Eubanks should never receive any part thereof, and conditioned fur-

ther that John H. Eubanks was to give and divide the balance to any other heirs as he saw fit."

The decree finds that the material averments of the bill of complaint have been proved; that the purported agreement of September 14, 1922, between deceased and his wife was invalid; that the deed from deceased to John was without consideration and void, as a fraudulent transaction designed to prevent the wife from obtaining any portion of his property in the event she should be successful in the divorce suit; that at the times when the moneys and certificates of deposit were received by John from his father the latter was afflicted with various insane delusions with respect to his wife, and particularly the insane delusion that she had been unfaithful in her marital vows and guilty of infidelity to him; that this was the motivating influence which induced him to transfer his money to John; that the moneys were not intended to be a gift to John absolutely, but that he received them in trust to make a just and equitable distribution among the other heirs; that despite the demands of the other heirs for a share in the property John has wrongfully claimed the moneys as his own; that the supposed trust with which John admits he is charged is so indefinite and uncertain that it cannot be given effect, and that the supposed gift was an invalid attempt by deceased to make a testamentary disposition of his property without complying with the statutes of this State. The decree adjudges that the deed is void; that the interest of deceased therein descended to his heirs; that the moneys in the bank as well as the certificates of deposit were the property of deceased at the time of his death and that they should be turned over to the administrator. For the purpose of this appeal it is unnecessary to refer to other portions of the decree.

A careful study of this record and the conflicting contentions of the parties convinces us that the disposition made of the case by the chancellor was right and that the

decree should be affirmed. We have considered all the evidence on the question of mental competency of deceased to dispose of his property, and agree with the chancellor that the weight of the evidence supports the conclusion that at the time he sought to dispose of his property he was not mentally competent to do so. In reaching this conclusion we have not been moved by evidence of his numerous eccentricities. It was shown that over a period of several years he lived a nomadic life, traveling about the country in an automobile, in which he also slept; that he lived also in a barn on one of his properties in Ames, with his dogs, while renting the house to others; that he was personally unclean and slovenly, and that he cooked his own meals and permitted his dogs to lick the plates, etc. Under the repeated decisions of this court, evidence of such and similar conduct does not, alone, establish mental incompetency. The record discloses, however, that at the time deceased made the purported agreement of September 14, 1922, and also later when he disposed of his property, he was laboring under the delusion that his wife had been unfaithful to him, in that she had had improper relations with the local undertaker. The evidence leaves no room for doubt that this belief of deceased was entirely unfounded. It was also established that he persisted in his belief, all argument and reasoning to the contrary. His persistence in this delusion is shown to have continued even after he had attempted to dispose of a portion of his moneys to his son John. The evidence indicates that these unfounded and unreasonable ideas about his wife induced deceased to dispose of his property in the manner complained of, despite the fact that his wife was then sixty-four years old and had struggled along as his helpmate through some forty-nine years of married existence.

It is difficult to define an insane delusion such as renders one incapable of disposing of his property, yet in its simplest form such a delusion has been defined as "a belief

in a state or condition of things in the existence of which no rational person would believe." (*Louby* v. *Key*, 258 Ill. 558; *Snell* v. *Weldon*, 243 id. 496; *Schneider* v. *Manning*, 121 id. 376.) An insane delusion has also been defined as a belief in something impossible under the circumstances surrounding the individual, which refuses to yield either to evidence or reason. (*Drum* v. *Capps*, 240 Ill. 524; *Carnahan* v. *Hamilton*, 265 id. 508.) Again, it has been said to be "a false belief for which there is no reasonable foundation, and which would be incredible, under the given circumstances, to the same person if of sound mind, and concerning which the mind of the" person so believing "was not open to permanent correction through evidence or argument." (*Walker* v. *Struthers*, 273 Ill. 387.) It is not every insane delusion that will avoid an instrument. The delusion is immaterial unless it is directly connected with the subject matter of the transaction sought to be invalidated. *Owen* v. *Crumbaugh*, 228 Ill. 380; *Pendarvis* v. *Gibb*, 328 id. 282; *Bailey* v. *Oberlander*, 329 id. 568.

In view of all the evidence, and particularly the showing as to the age of deceased and his wife at the time of his unfounded and irrational beliefs concerning her, which apparently induced him to act, we are of the opinion that deceased was laboring under and largely influenced by an insane delusion at the time he attempted to dispose of his property, and that the attempted transfers of both the real estate and the personalty were therefore invalid. *Snell* v. *Weldon, supra; Albrecht* v. *Hittle*, 248 Ill. 72.

The decree of the circuit court of Piatt county is therefore affirmed.

*Decree affirmed.*

Mr. JUSTICE HERRICK took no part in this decision.